# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PFIZER INC., PHARMACIA & UPJOHN ⟩
COMPANY, PHARMACIA & UPJOHN ⟩
COMPANY LLC, SUGEN, INC., C.P. ⟩
PHARMACEUTICALS INTERNATIONAL ⟩
C.V., PFIZER PHARMACEUTICALS LLC, ⟩
and PF PRISM C.V., ⟩
⟩    C.A. No. 10-528 (GMS)
     Plaintiffs, ⟩
⟩
    v. ⟩
⟩
MYLAN PHARMACEUTICALS INC., ⟩
⟩
     Defendant. ⟩

## PLAINTIFFS' POST-TRIAL PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

OF COUNSEL:

William E. McDaniels
Thomas H. L. Selby
Jessamyn S. Berniker
Stanley E. Fisher
Scott K. Dasovich
Jessica M. Stoll
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Tel: (202) 434-5000

February 6, 2013

*Attorneys for Plaintiffs Pfizer Inc., Pharmacia*
*& Upjohn Co., Pharmacia & Upjohn Co. LLC,*
*Sugen, Inc., CPPI C.V., Pfizer Pharmaceuticals*
*LLC, and PF Prism C.V.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ......................................................................................................................1

PROPOSED FINDINGS OF FACT ...........................................................................................2

I.      BACKGROUND ..............................................................................................................2

II.     THE CLAIMED INVENTION IS NOT OBVIOUS. .....................................................3

       A.      The POOS Would Not Have Selected Mylan's Compounds as Leads....................3

       B.      The POOS Would Not Have Made the Modifications Mylan Proposes. ...............9

       C.      The POOS Would Not Have Had Reasonable Expectation of Success................16

       D.      The L-Malate Salt Form of Sunitinib Would Not Have Been Obvious. ..............18

       E.      The Inventors' Path Confirms that the Invention Was Not Obvious....................19

       F.      Objective Indicia Support a Conclusion of Non-Obviousness. ...........................21

PROPOSED CONCLUSIONS OF LAW ...................................................................................25

I.      BACKGROUND ............................................................................................................25

II.     THE CLAIMED INVENTION IS NOT OBVIOUS. ...................................................26

       A.      The POOS Would Not Have Selected Mylan's Compounds as Leads..................26

       B.      The POOS Would Not Have Made the Modifications Mylan Proposes. .............28

       C.      The POOS Would Not Have Had Reasonable Expectation of Success................35

       D.      The L-Malate Salt Form of Sunitinib Would Not Have Been Obvious. ..............36

       E.      The Inventors' Path Confirms that the Invention Was Not Obvious....................37

       F.      Objective Indicia Support a Conclusion of Non-Obviousness. ...........................37

CONCLUSION...........................................................................................................................40

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
    776 F.2d 281 (Fed. Cir. 1985)....................................................................25

*Bone Care Int'l., L.L.C. v. Roxane Labs., Inc.*,
    2012 WL 2126896 (D. Del. June 11, 2012)..............................................26

*Cordis Corp. v. Boston Scientific Corp.*,
    431 F. Supp. 2d 442 (D. Del. 2006).........................................................40

*Crocs, Inc. v. Int'l Trade Comm'n*,
    598 F.3d 1294 (Fed. Cir. 2010)................................................................40

*Daiichi Sankyo Co. v. Matrix Labs., Ltd.*,
    619 F.3d 1346 (Fed. Cir. 2010)........................26, 27, 29, 30, 31, 32, 33, 35, 38

*Daiichi Sankyo Co. v. Mylan Pharm. Inc.*,
    670 F. Supp. 2d 359 (D.N.J. 2009) .....................................................37, 39

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
    851 F.2d 1387 (Fed. Cir. 1988)................................................................40

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009)................................................................30

*Eisai Co. v. Dr. Reddy's Laboratories Ltd.*,
    533 F.3d 1353 (Fed. Cir. 2008)......................................................29, 31, 36, 39

*Eli Lilly & Co. v. Sicor Pharm., Inc.*,
    705 F. Supp. 2d 971 (S.D. Ind. 2010) ..................................................38, 39

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*
    689 F.3d 1368 (Fed. Cir. 2012).............................................29, 30, 32, 34, 38

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
    471 F.3d 1369 (Fed. Cir. 2006)................................28, 29, 30, 31, 32, 33, 34

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
    2001 WL 1397304 (S.D. Ind. Oct. 29, 2001) .........................................27, 35, 39

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
    364 F. Supp. 2d 820 (S.D. Ind. 2005) ...................................................33, 39, 40

*Impax Labs., Inc. v. Aventis Pharm. Inc.*,
    468 F.3d 1366 (Fed. Cir. 2006)................................................................28

*In re '318 Patent Infringement Litig.*,
578 F. Supp. 2d 711 (D. Del. 2008)........................................................39, 40

*In re Alfuzosin Hydrochloride Patent Litig.*,
2010 WL 1956287 (D. Del. May 14, 2010)...................................................39

*In re Arkley*,
455 F.2d 586 (C.C.P.A. 1972) .........................................................................27

*In re Dow Chem. Co.*,
837 F.2d 469 (Fed. Cir. 1988)..........................................................................37

*In re Hedges*,
783 F.2d 1038 (Fed. Cir. 1986)........................................................................30

*In re Papesch*,
315 F.2d 381 (C.C.P.A. 1963).........................................................................38

*In re Petering*,
301 F.2d 676 (C.C.P.A. 1962) ........................................................................27

*In re Rosuvastatin Calcium Patent Litig.*,
-- F.3d --, 2012 WL 6217356 (Fed. Cir. Dec. 14, 2012) ..........................31, 32

*In re Ruschig*,
343 F.2d 965 (C.C.P.A. 1965) ........................................................................28

*In re Ruschig*,
379 F.2d 990 (C.C.P.A. 1967) ........................................................................28

*Janssen Pharmaceutica N.V. v. Mylan Pharm., Inc.*,
456 F. Supp. 2d 644 (D.N.J. October 13, 2006) ........................................33, 36

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012)........................................................................40

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)..........................................................................28, 30, 36

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
730 F.2d 1452 (Fed. Cir. 1984)........................................................................39

*Merck Sharp & Dohme Pharms., Srl. v. Teva Pharm. USA, Inc.*,
2009 WL 3153316 (D.N.J. Aug. 19, 2009) ......................................................26

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
103 F.3d 1538 (Fed. Cir. 1997)........................................................................37

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
   520 F.3d 1358 (Fed. Cir. 2008)..................................................................29

*Ortho-McNeil Pharm., Inc. v. Teva Pharm. Indus.*,
   344 F. App'x 595 (Fed. Cir. 2009) ............................................................39

*OSI Pharm., Inc. v. Mylan Pharm. Inc.*,
   858 F. Supp. 2d 341 (D. Del. 2012)..........................................................40

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
   678 F.3d 1280 (Fed. Cir. 2012)...................................................26, 27, 28

*Pfizer Inc. v. Teva Pharm. U.S.A., Inc.*,
   -- F. Supp. 2d --, 2012 WL 2951367 (D. Del. July 19, 2012) ..................38

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007)..................................................................36

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009)..................................29, 30, 37, 38, 39

*Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*,
   536 F. Supp. 2d 476 (D. Del. 2008)..........................................................38

*Sanofi-Synthelabo v. Apotex Inc.*,
   492 F. Supp. 2d 353 (S.D.N.Y. 2007).................................27, 28, 36, 38

*Sciele Pharma Inc. v. Lupin Ltd.*,
   684 F.3d 1253 (Fed. Cir. 2012)..................................................................25

*Source Search Techs. LLC v. LendingTree, LLC*,
   588 F.3d 1063 (Fed. Cir. 2009)...........................................................30, 34

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
   655 F.3d 1364 (Fed. Cir. 2011)..................................................................30

*Takeda Chem. Indus. v. Alphapharm Pty., Ltd.*,
   492 F.3d 1350 (Fed. Cir. 2007).................26, 28, 29, 30, 31, 33, 34, 39

*Tec Air, Inc. v. Denso Mfg. Mich., Inc.*,
   192 F.3d 1353 (Fed. Cir. 1999)...........................................................27, 34

*Valeant Int'l v. Watson Pharm., Inc.*,
   2011 WL 6792653 (S.D. Fla. Nov. 8, 2011).............................................36

*Winner Int'l Royalty Corp. v. Wang*,
   202 F.3d 1340 (Fed. Cir. 2000)..................................................................30

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*,
    231 F.3d 1339 (Fed. Cir. 2000)............................................................................................35

## OTHER AUTHORITIES

35 U.S.C. § 103.................................................................................................................26, 37

35 U.S.C. § 282.......................................................................................................................25

**INTRODUCTION**

Defendant Mylan Pharmaceuticals Inc. ("Mylan") falls far short of proving that it would have been obvious to make the active ingredient in Sutent®, a drug that revolutionized the treatment of renal cell carcinoma and pancreatic neuroendocrine tumors, garnering over a billion dollars in annual sales. This is not a close case. Mylan's proof, offered through a single witness who did not work in the relevant field at the time, is sorely deficient on every material point. Indeed, it is entirely based on impermissible hindsight.

Mylan proposes three lead compounds: a hypothetical construct never disclosed or tested in the prior art; a compound so unremarkable it went almost entirely unnoticed in the art; and an early clinical candidate with middling potency and significant flaws that had been eclipsed by far superior alternatives by the priority date. The relevant art is so unpredictable that changing one atom can eliminate potency. Nonetheless, to arrive at the claimed compound "sunitinib," Mylan asks the Court to conclude that it would have been obvious for a skilled artisan to make *at least four* unique chemical modifications, none of which had ever previously been attempted on compounds of this type, and which together yield a completely different, sixty percent larger molecule. Mylan asks the Court to ignore modifications specifically taught in the art that led away from sunitinib, in favor of entirely speculative changes, not suggested anywhere. Finally, Mylan asks the Court to accept that it would have been obvious to use a salt form so rare it does not appear on the contemporaneous list of salts in FDA-approved products. The objective indicia of non-obviousness—including that Sutent® treats conditions that for decades had been considered hopeless—are overwhelming and further reinforce the conclusion of non-obviousness.

Plaintiffs (collectively, "Pfizer") respectfully submit these proposed Findings of Fact and Conclusions of Law.

1

**PROPOSED FINDINGS OF FACT**

## I.    BACKGROUND

1.    This is a patent infringement action brought by Pfizer arising out of Mylan's

filing of an Abbreviated New Drug Application with the FDA seeking approval to sell a generic

version of sunitinib L-malate, an anti-cancer drug marketed by Pfizer under the trade name

Sutent®.  The parties agree that Plaintiffs own the patents-in-suit and have standing to bring this

case.  D.I. 138 at 5.  Claims 5 and 21 of U.S. Patent No. 6,573,293 ("the '293 patent") and claims

1 and 2 of U.S. Patent No. 7,125,905 ("the '905 patent") cover sunitinib, its L-malate salt, and

pharmaceutical formulations of them.  Mylan concedes that its proposed products infringe these

claims, assuming they are valid.  D.I. 138 at 5.  The parties have agreed that the relevant priority

date to assess validity is October 27, 2000.  D.I. 138-1 at 2-3.  The only issue before the Court is

obviousness, and the prior art references upon which Mylan relies for its defense were

considered by the Patent Office before issuing the patents-in-suit.  Ex. 1 at 2-9; Ex. 2 at 2-7.

2.    Sunitinib was synthesized in the late 1990s by chemists at Sugen, a company that

ultimately came to be owned by Pfizer.  Tr. 667:5-9, 640:8-12 (Sun).[1]  Sunitinib is a "receptor

tyrosine kinase" ("RTK") inhibitor that belongs to a class of compounds called "oxindoles" or

"indolinones."  Ex. 1 at 10.  By targeting specific RTKs, it suppresses the generation of new

blood vessels, i.e., "angiogenesis," inhibiting tumor growth and shrinking tumors.  *Id.* at 92-93.

3.    In October 2000, the most studied approaches to treating cancer attacked tumors

directly.  Tr. 309:22-311:16 (Lydon).  In contrast, the idea of treating cancer by blocking

angiogenesis, first suggested in 1971, was unproven; no such agent had been approved by the

FDA.  Ex. 80; Tr. 310:8-313:11 (Lydon); Tr. 192:16-18 (Denny).  Researchers recognized that it

---

[1] For convenience, pictures of Plaintiffs' witnesses are attached as Exhibit A.

was "impossible to say whether any of the angiogenesis inhibitors [would] work." Ex. 318 at 1; Tr. 317:14-321:13 (Lydon). Scientists were pursuing many strategies to target angiogenesis; inhibiting RTKs with small molecules was not the most developed approach, and its chance of success was considered low. Tr. 309:21-316:7 (Lydon); Ex. 89 at 2, Table 1; Ex. 464 at 3.

## II. THE CLAIMED INVENTION IS NOT OBVIOUS.

4.      The hypothetical person of ordinary skill in the art ("POOS") would have had the skills of a Ph.D.-educated medicinal chemist working with synthetic chemists, biologists, pharmacologists, clinicians, and individuals experienced with solid form selection and pharmaceutical formulation. Ex. 641; Tr. 306:19-307:13 (Lydon); Tr. 77:22-78:8 (Denny); Ex. 1021. The POOS would also have had direct knowledge and expertise regarding the kinase targets and chemical scaffolds considered relevant for the development of angiogenesis inhibiting drugs as of the priority date. *Id*. The parties' definitions of the POOS are effectively the same, and the Court's findings and conclusions do not depend on which definition is applied.

### A. The POOS Would Not Have Selected Mylan's Compounds as Leads.

5.      The POOS seeking to develop a small molecule anti-angiogenic RTK inhibitor as of the priority date would have balanced the following criteria in selecting a lead: (a) *in vitro* potency against the primary target, VEGFR (vascular endothelial growth factor receptor 2), and secondary targets, PDGFR (platelet derived growth factor receptor) and FGFR (fibroblast growth factor receptor); (b) *in vivo* activity; and (c) favorable pharmaceutical properties including oral bioavailability and solubility. Tr. 321:20-324:19, 347:11-348:15 (Lydon); Tr. 98:20-101:19, 194:19-1976 (Denny); Ex. 403 at 4, 8. The compounds Mylan identifies as proposed leads would have been rejected in favor of many, far better alternatives.

6.      In the late 1990s, many companies were working to develop anti-angiogenic RTK inhibitors. Tr. 334:6-19 (Lydon). Sugen, a small startup, focused on oxindole compounds with

3

the goal of developing a VEGFR inhibitor.  Tr. 641:8-642:14 (Sun).  In its Sun 1998 paper,

Sugen reported structure-activity relationship ("SAR") data for a number of early compounds.

Ex. 112.  Hoping to attract the attention of potential acquirers, Sugen rushed a development

compound from this set, SU5416, into the clinic.  Tr. 649:16-650:1 (Sun); Ex. 75a at 2.  But

SU5416 had a number of serious defects.  It was not particularly potent against VEGFR, and it

was insoluble and not orally bioavailable, which meant that patients would have to come into a

clinic *every day* for intravenous administration.  *E.g.*, Tr. 317:4-13, 336:19-338:9, 345:5-346:8

(Lydon); Tr. 221:10-221:19 (Denny); Tr. 748:17-749:2 (Bukowski); Tr. 985:3-14 (Ratain).

       7.     Recognizing these concerns, Sugen went about designing better oxindoles while

SU5416 was in the clinic.  Tr. 651:20-652:16 (Sun).  First, Sugen broadened its target profile,

adding the PDGFR and FGFR targets.  *Id.*; Ex. 75a at 2.  Then it undertook additional SAR

efforts, this time using x-ray crystallography tools to guide its work.  Ex. 98; Ex. 113 at 3.  In the

process, Sugen discovered and publicly disclosed that a propionic acid group on the pyrrole

ring—missing from SU5416—was "required" for potency against the targets.  Ex. 113 at 3, 7;

Ex. 98 at 5; Ex. 114 at 4, 6; Tr. 363:4-377:7 (Lydon); Tr. 648:9-15 (Sun); Ex. B, Lydon Dem.

       8.     **Compounds 11f, 9a and 9b.**  In its later papers, Sugen identified many "second

generation" compounds—all with propionic acids—with far better potency than SU5416 and the

other early compounds.  The Sun 1999 paper identified several, including compound 11f, that

had very good potency against all three targets.  Ex. 113 at 4; Tr. 365:8-369:15 (Lydon).

       9.     The most potent prior art oxindoles were indentified in the Sun 2000 paper.  Ex.

114 at 4, 6; Tr. 369:16-374:18 (Lydon).  Among them, compounds 9a and 9b stood out, with 25-

fold and over 100-fold better cellular potencies against the VEGFR target than SU5416 and

much better potency against the secondary targets.  *Id.*; Tr. 218:22-220:11, 229:17-24 (Denny).

Compound 9b was orally bioavailable and demonstrated significant activity against three cancer cell lines *in vivo*, including two that SU5416 did not inhibit.  Ex. 12 at 217-19; Tr. 375:11-376:13 (Lydon); Tr. 229:25-232:19 (Denny).

10.     **SU6668.**  Sugen soon selected a second-generation compound, SU6668, as its next clinical candidate.  Tr. 378:21-379:3 (Lydon).  SU6668 featured the propionic acid that modeling had suggested was essential for potency.  Tr. 463:16-464:19 (Stafford).  SU6668 inhibited all three targets *in vitro* and showed better inhibition than SU5416 in all eight tumor types tested *in vivo*.  Tr. 380:13-385:21 (Lydon); Ex. 94; Ex. 91 at 1, 3-6; *compare* Ex. 91 at 6, Table 3, *with* Ex. 96 at 6, Table IV; Ex. 106 at 1, 4.  Unlike SU5416, it caused tumor regression in large, established tumors.  Ex. 91 at 6; Tr. 384:4-385:6 (Lydon); Tr. 657:21-658:11 (Sun).

11.     "The molecular modification of SU5416 provided significant improvements in pharmacokinetics, oral bioavailability, efficacy, preclinical safety, and pharmaceutical properties of SU6668."  Ex. 632; *see also* Ex. 401.  By October 2000, preliminary human clinical results showed that unlike SU5416, SU6668 was orally administrable, did not have dose-limiting toxicities, could be dosed daily, and did not exhibit excessive metabolism or clearance. *Compare* Ex. 637, *with* Ex. 954; Tr. 226:8-22 (Denny); Tr. 385:22-388:19, 441:20-444:22 (Lydon).

12.     While Sugen was pursuing its oxindole research, other companies had been working with other compound classes, with notable success.

13.     **PTK-787.**  Novartis had advanced a phthalazine compound, PTK-787, into clinical trials by October 2000.  Ex. 76 at 1-2; Tr. 334:24-342:5 (Lydon).  It eclipsed SU5416 in VEGFR potency in two different head-to-head assays and showed very good activity against PDGFR.  Tr. 336:19-338:11 (Lydon); Ex. 76 at 7, Table 3.  It also demonstrated significant *in vivo* inhibition when administered orally and had excellent pharmacokinetic properties,

outperforming SU5416 in one pharmacokinetic assay by a factor of 100.  Tr. 339:7-341:16
(Lydon); Ex. 76 at 7; Ex. 122 at 5-7, Fig. 4, Table 2, Fig. 8; Ex. 370 at 1.

14.     **ZD 4190.**  Astrazeneca had developed ZD 4190, a quinazoline compound.  Tr.
342:6-351:12 (Lydon).  Unlike oxindoles, quinazolines had been extensively studied and by
October 2000, at least five quinazoline RTK inhibitors were in the clinic.  Tr. 342:6-343:10,
389:6-390:10 (Lydon); Ex. 806 at 1, Table 1; Ex. 529.  ZD 4190 was much more potent than
SU5416 against VEGFR and further had activity against FGFR.  Tr. 343:11-347:6 (Lydon); Ex.
403 at 2, 4, Table 3; Ex. 113 at 4 (ID 2); Ex. 76 at 7, Table 3.  It was also orally bioavailable and
inhibited tumor growth between 79% and 95% in four different cancer cell lines *in vivo* when
administered orally.  Tr. 347:11-350:20 (Lydon); Ex. 403 at 8, Table 4; Ex. 528 at 4, Table 2.

15.     **PD-74 and PD-85.**  Parke-Davis had developed a set of pyrido-pyrimidines, also
an extensively studied class.  Tr. 351:13-362:11 (Lydon); Exs. 353, 472, 368, 450.  PD-173074
("PD-74") was a potent VEGFR and FGFR inhibitor, with over 1000-fold better potency against
FGFR than SU5416.  Tr. 353:5-361:10 (Lydon); Ex. 368 at Tables 1, 3; Ex. 450 at 7.  It also had
very impressive activity *in vivo,* was orally bioavailable, and had a published crystal structure
providing guidance to the POOS on how to modify it.  Tr. 354:22-361:20 (Lydon); Ex. 368 at
Fig. 5, Table 4; Ex. 450 at 4-6.  PD-166285 ("PD-85") had very potent activity against all three
targets as compared to SU5416, impressive *in vivo* activity, and was orally bioavailable.  Tr.
352:8-355:23 (Lydon); Ex. 368 at Tables 1, 3, 4, Fig. 5; Ex. 472 at Table 1; Ex. 113 at 4 (ID 2).

16.     Mylan asserts the POOS would have selected three compounds as leads:
(1) Sugen's SU5416; (2) Sugen's SU5408; and (3) the "hypothetical '422 compound," which
Mylan contends is disclosed in Sugen's Patent Application WO 99/61422 ("the '422
application").  Dr. Denny's analysis leading to this selection was flawed, however, in that unlike

6

Dr. Lydon, he did not consider competitor compounds or analyze the whole field.  *See* Tr. 126:2-8 (Denny).  Given the improvements in the art by October 2000 and superior alternatives, including SU6668, compounds 11f, 9a, and 9b, PTK-787, ZD4190, PD-74, and PD-85, the POOS would not have selected Mylan's compounds as leads.  *See* FOF ¶¶ 8-15; Tr. 341:17-342:5, 350:22-351:12, 361:21-363:3, 368:9-369:15, 371:7-21, 376:14-378:20, 388:4-19 (Lydon).

17.    **SU5416.**  While SU5416 certainly had garnered early excitement, *see* Ex. 82, the art had moved beyond it by the priority date.  Mylan admits that by October 2000, the POOS recognized significant shortcomings of SU5416, including weak inhibition of PDGFR and FGFR, poor solubility, lack of oral bioavailability and metabolism issues.  Tr. 130:5-12, 221:10-222:12, 228:2-229:10 (Denny); Tr. 367:4-17 (Lydon); *see* FOF ¶¶ 6-7, 10-11.  Sugen's second generation compounds already had addressed the problems plaguing SU5416 and performed far better *in vitro* and *in vivo*.  *See* FOF ¶¶ 6-11; Tr. 222:13-226:22 (Denny); Ex. 632.  Sugen's competitors had also developed compounds that were much more potent against the targets than SU5416, had demonstrated impressive *in vivo* activity, and, unlike SU5416, were orally bioavailable.  *See* FOF ¶¶ 13-15.

18.    The POOS would not have taken a step backward to start with SU5416.  Rather, the POOS would have started where Sugen left off, with the better second generation oxindoles, like SU6668 or compound 9b, or the very promising competitor compounds, PTK-787, ZD 4190, PD-74 or PD-85.  Tr. 334:3-23 (Lydon); *see* FOF ¶¶ 6-16.

19.    **SU5408.**  Mylan asserts that the POOS would have selected SU5408 as a lead for its potency against VEGFR.  Tr. 204:13-16 (Denny).  This early oxindole was reported in Sun 1998 as having potency against VEGFR in a preliminary cellular assay.  Tr. 326:22-333:3 (Lydon); Ex. 112 at 7 (ID 48); Ex. 6 at 26, Table 1.  The limited VEGFR data for SU5408 do not

stand out among other first generation compounds, and it was essentially inactive against the secondary targets. *Id.*; Ex. 6 at 32, Table 2; Tr. 206:17-18, 209:23-213:7 (Denny). By October 2000, its potency had been far surpassed by the second generation oxindoles and competitor compounds described above. Tr. 208:18-209:8 (Denny); Ex. 114 at 4, Table 2; Ex. 76 at 7; Ex. 403 at 3-4, Tables 1-3; Ex. 368 at 5-6, Tables 1, 3; *see* FOF ¶¶ 8-16.

20.     In addition, there was no *in vivo*, pharmacokinetic or oral bioavailability data on SU5408, although the POOS would have understood that it was *not* soluble or orally bioavailable. Tr. 333:10-24 (Lydon); Tr. 205:24-207:12 (Denny). The dearth of information on SU5408 and its failure to meet many of the criteria for a lead would have convinced the POOS that the compound was not worth pursuing—a conclusion the POOS would have understood was shared by Sugen, which had not further investigated it. Tr. 333:13-334:2, 371:19-372:21 (Lydon); Tr. 205:24-207:12 (Denny). As Dr. Denny conceded, "[v]ery little work was done" with SU5408. Tr. 207:4-12 (Denny). This compound would not have been selected as a lead, given the very promising and much better tested alternatives available to the POOS. Tr. 326:22-334:2; *see* FOF ¶¶ 8-16.

21.     **The Hypothetical '422 Compound.** Mylan identifies the hypothetical '422 compound as a third lead, although it is not identified by name, number, or structure anywhere in the prior art, and there was no data about it whatsoever. Ex. 12; Tr. 198:19-199:17, 202:5-19 (Denny); Tr. 325:11-326:1 (Lydon). Mylan calls it "dimethyl sunitinib," but, as Dr. Denny acknowledged, that name is "purely hindsight." Tr. 198:19-199:11.

22.     Dr. Denny claims that the POOS would have combined two precursors from among a large set found in the '422 application to form this compound. Tr. 199:18-21 (Denny). However, the prior art taught no reason to combine these particular precursors, and the POOS

8

would not have envisioned the compound among the over 1,200 possible combinations.  Tr. 523:9-524:16, 529:6-530:25 (Stafford); Tr. 199:18-200:8, 201:23-202:4 (Denny); Ex. 12 at 26-27.[2]  As Dr. Denny admitted, the hypothetical compound is "certainly not singled out in any way in the patent."  Tr. 201:23-202:4.  In fact, the '422 application encompasses, exemplifies and claims only compounds with a side chain which is absent from the hypothetical '422 compound and sunitinib.  Ex. 12; Tr. 524:8-529:5 (Stafford).[3]

23.     Despite Mylan's hindsight-driven reconstruction, the hypothetical '422 compound is simply not disclosed in the prior art at all.  Therefore, it cannot be a lead compound from the prior art.  But even if it were disclosed, the POOS would not have selected it as a lead given that there was not even a shred of data about its activity or properties, particularly in light of the many promising alternatives that had been studied extensively.  Tr. 325:11-326:21 (Lydon); Tr. 531:1-14 (Stafford); Tr. 198:1-18 (Denny); *see* FOF ¶¶ 8-16.

## B.     The POOS Would Not Have Made the Modifications Mylan Proposes.

24.     Even starting with a Mylan lead, the POOS would not have made the myriad modifications required to arrive at sunitinib.  Tr. 462:20-463:14 (Stafford).  Mylan asserts that if starting with SU5416, the POOS would first add an electron-withdrawing group like an ester on the pyrrole ring to effectively convert it into SU5408.  Tr. 139:16-140:5, 233:4-7 (Denny); Tr. 463:6-466:4 (Stafford); Ex. C, Stafford Dem. 1.  From there, the POOS would have had to make five additional decisions to arrive at sunitinib: (a) convert the C-4' ester to an amide; (b) add a

---

[2] Dr. Denny admits that the selection of the two precursors depends upon the layered assumptions that the POOS wanted a compound with a C-5 fluorine, an amide, and an amine solubilizing group, Tr. 202:20-204:1 (Denny), assumptions which are incorrect.  FOF ¶¶ 25-41.

[3] The POOS would have understood from the dash in "-(alk$_1$)Z" that the compounds of the '422 application had an alkyl group directly attached to the pyrrole ring at C-4', which is not the case for the hypothetical '422 compound or sunitinib.  Tr. 525:24-528:3, 631:1-634:8 (Stafford); Ex. 12 at 13.  None of Mylan's witnesses offered testimony on this issue.

diethylamine side chain; (c) attach the side chain to the amide via a two-carbon linker; (d) add a

fluorine to the C-5 position of the oxindole core; and (e) retain the C-3' and C-5' methyls.  None

of these decisions would have been obvious, let alone all of them; indeed no one made sunitinib

in the nearly 4 years between the disclosure of SU5416 in 1996 and the priority date.  Tr. 463:6-

466:2, 547:7-11 (Stafford); Ex. 11.  These modifications are depicted here:



25.    **Electron-Withdrawing Ester at C-4'.**  The POOS would not have placed an

electron-withdrawing polar group like an ester at the C-4' position because "[t]he art had clearly

advanced to electron-donating propionic acid groups" on the pyrrole ring by October 2000.  Tr.

463:10-466:2 (Stafford); Exs. 12, 91, 98, 113, 114 (all featuring propionic acid compounds).

26.    After SU5416 had been selected for development, crystallographic studies and

modeling revealed that placing an electron-donating propionic acid on the pyrrole ring resulted

in favorable interactions with FGFR and VEGFR.  Tr. 466:23-470:4 (Stafford); Tr. 648:9-15

(Sun); Ex. 98 at 4-5.  Sugen followed up in Sun 1999 by designing and testing a set of

compounds with propionic acid side chains, and concluded that the propionic acid side chain was

"required" for potency against all three targets. Ex. 113 at 1-3, 7; Tr. 470:5-473:9 (Stafford); Tr.

216:22-218:15 (Denny); Tr. 363:4-365:23 (Lydon).

27.     Sugen then selected SU6668, with an electron-donating C-4' propionic acid, as its second clinical candidate.  The patent application covering SU6668 only reported testing of compounds with electron-donating side chains on the pyrrole ring.  Ex. 12 at 40-45; Tr. 215:3-216:21 (Denny).  SU6668 was "preferred."  Ex. 12 at 220; Tr. 473:10-474:11 (Stafford).  Other publications provided crystal structure data confirming that the propionic acid was favorable for potency and improved pharmacokinetics, including metabolism and clearance.  Ex. 91 at 4, Fig. 2; Tr. 474:12-477:19 (Stafford); Ex. 632 at 2; Ex. 401 at 1; Tr. 223:4-227:4 (Denny).

28.     As reported in Sun 2000, Sugen went on to synthesize and test another series of compounds with electron-donating propionic acids, now at the C-3' position.  Ex. 114; Tr. 477:20-478:9 (Stafford); Tr. 218:22-221:9 (Denny).  The authors stated that those compounds "exhibit[ed] the most profound potencies" against the three angiogenesis targets that had been seen, again concluding that the propionic acid group was "required" for potency.  Ex. 114 at 6; Tr. 477:20-478:9 (Stafford); Tr. 363:4-364:23, 374:5-18 (Lydon); Tr. 220:12-221:9 (Denny).

29.     In contrast, there was no discussion of electron-withdrawing side chains in any of the literature after Sun 1998.  Tr. 469:25-470:4, 473:7-478:9 (Stafford); Tr. 214:1-215:1 (Denny).  Given these teachings, the POOS would have been led away from electron-withdrawing side chains and toward propionic acids.  Tr. 478:10-14, 463:7-466:4 (Stafford).

30.     **Amide at C-4'.**  If the POOS had modified SU5416 to form SU5408 by adding an ester—or had simply started with SU5408—the POOS would not have then jettisoned that ester and replaced it with an amide.  As Dr. Stafford explained, "it's not readily apparent why one would select the ester and then immediately modify it to . . . the amide."  Tr. 479:1-5.  Dr. Denny opined that the POOS would have been concerned about ester hydrolysis.  Tr. 153:14-22.  But many successful drugs have esters.  Ex. C, Stafford Dem. 2; Tr. 482:25-483:24 (Stafford); Ex.

11

627 at 4, 21, 22.  There was no suggestion that hydrolysis would be a problem for this particular

ester, and in fact, the POOS would have believed that other features of the molecule protected it

from hydrolysis.  Tr. 479:7-482:24 (Stafford); *e.g.*, Ex. 340 at 1, 4; Ex. 83 at 3.  Therefore, it

would not have been obvious to change the ester.  Tr. 483:25-484:6 (Stafford).

      31.    Even if the POOS nonetheless were to change the ester, there is no suggestion in

the art toward an amide functional group.  There is not even an example of an amide-substituted

oxindole-pyrrole, like sunitinib, anywhere in the prior art.  Tr. 233:4-18 (Denny).  Instead, the art

strongly taught toward electron-donating substituents.  *See* FOF ¶¶ 25-29.  Even ignoring that

art, the POOS would not have chosen an amide as a "fix" for hydrolysis, because amides can

also be hydrolyzed.  Tr. 485:3-23 (Stafford); Tr. 234:21-235:13 (Denny); Ex. 83 at 3.  Instead,

the POOS would have selected from among dozens of other, more stable electron-withdrawing

options.  Tr. 484:7-486:6 (Stafford); Tr. 235:14-236:6 (Denny); Ex. C, Stafford Dem. 3.

      32.    **Diethylamine on the Amide.**  If the POOS had replaced the ester of SU5408 with

an amide, it would not have been obvious further to append a diethylamine side chain—a whole

new functional group—to the amide to improve solubility, as Dr. Denny contends.  Tr. 242:24-

243:4 (Denny).  First, the POOS would have had no reason to believe there would be a solubility

problem to solve because even without the side chain, the solubility measure C-logP for the

amide-substituted compound was in the optimal range.  Tr. 490:2-491:4 (Stafford).  There are

also many marketed drugs with amides that are not attached to solubilizing chains.  Tr. 491:5-

492:13 (Stafford); Ex. 627 at 6, 12, 15, 17, 28; Ex. 585 at 10; Ex. C, Stafford Dem. 4.

      33.    If the POOS had still wanted to add a solubilizing group, there were hundreds of

common options, including acidic groups and basic groups.  Tr. 492:25-439:4, 494:3-21, 497:22-

499:2 (Stafford); Tr. 241:4-248:13 (Denny); Ex. C, Stafford Dem. 5.  Given the teachings in the

art, the POOS would have preferred to add a propionic acid over a basic amine.  Tr. 249:12-23

(Denny); Ex. 114 at 6; FOF ¶¶ 25-29.  The POOS certainly had no reason to select diethylamine

from among the many possible bases:  there is no teaching of one on any prior art oxindole.  Tr.

242:24-243:4 (Denny); Tr. 494:24-498:20 (Stafford).  In fact, Dr. Denny often chose different

side chains in his own RTK inhibitor work.  Tr. 243:5-248:13 (Denny).

34.    Furthermore, there are a number of other positions on the molecule that would

have been more attractive places to attach a side chain than the amide at the C-4' position.  Tr.

492:17-494:4 (Stafford); Ex. C, Stafford Dem. 5.  There was certainly no reason to select a

diethylamine and put it at that position.  Tr. 242:24-243:4, 249:9-250:11 (Denny).

35.    **Linker.**  Without the benefit of test data on such compounds—there was none—

the POOS would not have had reason to use a two-carbon linker between the amide and the

diethylamine, as opposed to a three- or four-carbon linker.  The POOS would have understood

that the length of a linker can have dramatic and unpredictable effects on the VEGFR potency of

a drug and would not have preferred a particular linker absent test data.  Tr. 500:1-502:8, 636:5-

637:5 (Stafford); Ex. 403 at 4, Table 2; Tr. 248:2-5 (Denny).

36.    **Fluorine at C-5.**  The POOS would not have found it obvious to make any

substitution at the C-5 position, let alone to replace the hydrogen with fluorine, which had never

been placed at that position.  Tr. 510:11-21 (Stafford); Tr. 254:10-12 (Denny).  There is no

support for this change apart from Dr. Denny's litigation-inspired concern about metabolism.

37.    Dr. Denny, admittedly not a metabolism expert, opined the POOS would have

been motivated to address metabolism at the C-5 position.  Tr. 250:17-251:2 (Denny).  Neither of

the references he cited gave the POOS reason to do so.  Tr. 502:9-14 (Stafford); Ex. 123; Ex.

863.  The first taught that metabolism at the C-5 position was "minor," which the POOS would

13

have understood to occur at a level of less than 10% of the parent drug.  Ex. 123 at 2; Tr. 502:15-503:18 (Stafford); Tr. 251:13-23 (Denny).  This would "rarely ever [be] addressed by a medicinal chemist."  Tr. 503:9-20 (Stafford).  The second did not even address pyrrole-substituted oxindoles.  Tr. 504:21-505:19 (Stafford); Ex. 863 at 941.  (A third reference raised by Mylan, but not Dr. Denny, is not prior art, but in any event is consistent with the first.  Tr. 553:5-554:2, 634:18-636:1 (Stafford); Ex. 916 at 1505-06.)  The fact that Sugen's second clinical candidate (SU6668) and next generation "prototype" (9a from Sun 2000, Ex. 114 at 5) had no C-5 substitution would have confirmed to the POOS that metabolism at that position was not a concern.  Ex. 115 at 6; Tr. 503:16-504:23 (Stafford); Tr. 252:5-253:5 (Denny).

38.     If the POOS were nonetheless addressing metabolism at C-5, there were many possible substitutions because "anything that you put at the 5 position blocks hydroxylation [metabolism]."  Tr. 514:25-518:3, 556:19-557:2 (Stafford); Ex. C, Stafford Dem. 6.  While prior art compounds had any number of substituents at the C-5 position, none had fluorine, confirming that it was not the obvious choice. Tr. 253:11-13 (Denny); Tr. 510:11-21 (Stafford).

39.     There was no data to support selection of the fluorine at the C-5 position.  Tr. 510:11-21 (Stafford); Tr. 254:10-12 (Denny).  Rather, a "specific teaching" of Sun 1998 is "avoid C-5 fluoro" because such electron-withdrawing substitutions are detrimental to activity.  Tr. 502:9-14, 505:20-508:15, 515:9-15 (Stafford); Tr. 255:2-4 (Denny); Ex. 112 at 9.  While Dr. Denny identified a compound with fluorine at a different position (C-6) to suggest that fluorine was not detrimental to potency, Tr. 137:10-21 (Denny), Sun 1999 taught that unlike C-6, the C-5 position preferred hydrophilic, not lipophilic, substitutions.  Tr. 508:12-510:9, 514:25-517:22 (Stafford); Ex. 113 at 3.  In short, "there are very specific teach-aways" from fluorine at C-5 because it was both electron-withdrawing *and* lipophilic.  *Id.*; Tr. 507:1-19 (Stafford).

14

40.     In contrast, the prior art suggested that adding electron-*donating* groups or large hydrophilic groups at the C-5 position would be advantageous for potency.  Tr. 507:23-510:9, 517:5-518:3, 557:16-562:9 (Stafford); Ex. 112 at 10-11; Ex. 113 at 3, 4; Ex. 114 at 5, Table 2.  Accordingly, Dr. Denny's argument that fluorine at the C-5 position is a "simple" change that would have been expected to solve a metabolism problem without affecting potency ignores the express teachings and data in the art.

41.     **The Hypothetical '422 Compound.**  Dr. Denny arrived at this undisclosed, data-less compound entirely on the basis of hindsight.  The POOS would not have selected it as a lead, nor found it obvious to change both methyl groups of the diethylamine to ethyl groups to form sunitinib.  Tr. 532:18-533:13 (Stafford).

42.     Dr. Denny opines that the POOS would have been concerned that the dimethylamine on the hypothetical '422 compound would be subject to "dealkylation," a type of metabolism that results in the cleavage of alkyl groups.  Tr. 257:21-25 (Denny).  However, there was no data suggesting this as an issue with the hypothetical '422 compound, and in fact many successful marketed drugs have dimethylamines.  Tr. 227:5-7 (Denny); Tr. 533:14-538:17 (Stafford); Ex. C, Stafford Dem. 7; Ex. 627 at 9, 11, 13, 23.  Even assuming this were a concern, the POOS would not have switched to a diethylamine because diethyl groups are also prone to dealkylation, but instead would have modified the compound differently.  Tr. 534:3-536:19, 537:8-539:23 (Stafford); Tr. 257:17-258:16 (Denny); Ex. 949 at 119; Ex. 871 at Table IV.

43.     **Methyls at C-3' and C-5'.**  Even if the POOS had somehow made the foregoing changes, the POOS would only have arrived at sunitinib if no other changes were made.  But by October 2000, the prior art clearly taught away from the C-3', C-5' dimethyls on the pyrrole ring of sunitinib.  Tr. 518:11-520:12 (Stafford); Ex. 113 at 4, Table 2; Ex. 114 at 4, Table 2; Tr.

15

255:12-257:16 (Denny).  The Sun 2000 compounds, with the greatest *in vitro* potency ever seen

in oxindoles, did not contain the C-3' and C-5' methyls.  Ex. 114 at 4; Tr. 518:11-519:14

(Stafford).  Even Dr. Denny acknowledged the numerous examples that lacked C-3' and C-5'

methyls, and nonetheless had favorable potency.  Tr. 255:6-257:16.  The POOS would also have

known that removing the C-5' methyl would eliminate "major" metabolism at that position.  Tr.

519:4-520:12 (Stafford); Ex. 123 at 2.  Hence, the POOS would not have found it obvious to

retain the C-3' and C-5' methyls.

### C.   The POOS Would Not Have Had Reasonable Expectation of Success.

44.   Even if the POOS had made all of the changes leading to sunitinib, the POOS

would not have had a reasonable expectation that it would retain, much less improve, the potency

of Mylan's leads.  Tr. 461:14-462:19, 466:5-22, 520:13-523:4, 611:12-613:17 (Stafford).

45.   The POOS would have expected each of Mylan's changes to have a negative or at

best unpredictable effect on potency.  The POOS would have been concerned that a solubilizing

side chain would decrease potency, as Dr. Denny conceded.  Tr. 249:5-11 (Denny); Tr. 498:25-

499:25 (Stafford).  Sun 1998 taught that an electron-withdrawing fluoro substitution at C-5

would diminish activity.  Tr. 506:24-508:15; 510:11-511:2 (Stafford).  And Dr. Denny admitted

that the POOS "honestly [would] not know" and "would not have a clear expectation" of the

effect on potency of replacing the ester with an amide.  Tr. 236:11-241:3 (Denny).  The POOS

would not have had a reasonable expectation of retaining or improving potency with this "very

significant change."  Tr. 478:22-479:1, 486:4-490:1 (Stafford).

46.   As shown by numerous examples, small changes to an oxindole compound often

have dramatic effects on potency.  Ex. 112 at 7; Tr. 459:13-461:13 (Stafford); Ex. 531; Tr.

193:18-194:18 (Denny).  According to Dr. Denny and the very references he cited, changes on

the oxindole and pyrrole positions "dramatically alter both specificity and potency."  Tr. 193:11-

16

194:18 (Denny); Ex. 96 at 30 (quoted in Denny Dem. at 65); Ex. 112.  And so, as Dr. Denny

recognized, it is "always necessary to test the effect of any substitution" to see if had its intended

effect.  Tr. 233:15-18, 236:11-20 (Denny).

47.     This unpredictability is compounded exponentially here.  The impact of any

particular substitution would depend in part on the other substitutions made, and Mylan proposes

to add a slew of new substituents.  Ex. 112 at 11; Tr. 460:20-461:13 (Stafford).  Yet there was no

data in the prior art on compounds with *any* of the substituents Mylan proposes to add:  the

amide, diethylamine, linker, or fluorine.  Tr. 233:4-18, 242:24-243:4, 254:10-12 (Denny); Tr.

494:22-497:17, 510:11-511:2 (Stafford).  Cumulatively, these additions result in a radically

different compound, a full 60-70% larger than SU5416, with highly uncertain attributes.  Tr.

499:3-25, 520:13-523:4 (Stafford).  As Dr. Stafford explained, "each one of those [additions] is a

significant change." Tr. 466:5-22. "The sum total is hard to imagine, especially in my world of

high attrition with single changes." *Id*.

48.     Even if the POOS had made sunitinib, the POOS still would not have reasonably

expected that it would have similar or improved activity over SU5408, SU5416, SU6668, or any

of the other compounds for which data existed.  Tr. 540:9-541:8 (Stafford).  Sunitinib is not

structurally similar to any of the prior art compounds.  It contains an amide adjacent to the

pyrrole ring, a lengthy diethylamine side chain connected to the amide via a linker, and a fluorine

on the C-5 position, none of which is contained in any prior art pyrrole-oxindole compound.  Tr.

539:24-541:8 (Stafford).  And coupled with the unpredictability of this field, the POOS would

not and could not have presumed any properties from a structure alone.  *Id.*  Nor would the

POOS have reasonably expected that sunitinib would behave similarly to or improve on the

17

hypothetical '422 compound, whose properties were unknown and unpredictable.  Tr. 539:24-540:8, 531:15-532:17 (Stafford); Tr. 325:11-326:15 (Lydon).

      **D.**     **The L-Malate Salt Form of Sunitinib Would Not Have Been Obvious.**

    49.    Mylan has also failed to show that the L-malate salt form of sunitinib would have been obvious.  Mylan did not offer any reason for the POOS to make the L-malate salt, arguing only that it was one option to try.  The record, however, does not support a conclusion that it would have been obvious to try malate as one of a finite set of predictable solutions to a problem.  First, Mylan has not identified a problem driving the POOS in the first place.  Second, it is not possible to predict whether a salt will even form, and Mylan's own expert agreed that the POOS could not predict any of its properties even if it did.  Tr. 681:8-15, 682:16-683:11 (Myerson); Ex. 492 at 5; Tr. 264:1-15 (Denny); Ex. 700 at 1.  Third, malate is extremely rare and if the POOS had turned to less common salts, malate was only one of "hundreds of acids that could [have been] considered."  Tr. 687:12-16, 689:7-20 (Myerson); Ex. 700 at 2; Hawley Tr. 69:7-8.

    50.    The POOS would ordinarily have tried to form only 2 to 4 of the most common salts, and malate would not have been one of them.  Tr. 261:5-10 (Denny); Tr. 683:12-686:23 (Myerson).  Even Dr. Denny acknowledged that malate is "one of the rarest salts used in pharmaceutical products," and although he has "made literally thousands of salts," he could not recall *ever* trying malate.  Tr. 176:17-19; 261:5-20 (Denny).  The most recent list of salts of FDA approved drugs prior to the priority date (with 1994 data) did not include a single malate salt.  Tr. 263:7-25 (Denny); Tr. 684:23-685:23 (Myerson); Ex. 328 at 3, Table 1.  Even the outdated list that used 1974 data, which the POOS would not have had reason to consult, only included malate with a frequency of 0.13%, representing a single drug.  Ex. 700 at 2, Table 1; Tr. 687:17-688:21 (Myerson); Ex. 85 at 2, Table 1 (reprinting 1974 data).  It is so rare that Mylan's only citation associating malate with a pharmaceutical in the decade before the priority date is a press release

18

regarding a drug in clinical trials that was a malate, though that reference offers no suggestion that the malate conferred any particular beneficial property.  Tr. 686:24-687:11 (Myerson).

51.     The record demonstrates that the POOS would neither have had reason to make a malate salt of sunitinib, nor a reasonable expectation that it could be formed or would have acceptable properties.  Tr. 681:8-683:11 (Myerson); Tr. 264:2-18 (Denny).

### E.     The Inventors' Path Confirms that the Invention Was Not Obvious.

52.     The inventors' four-and-one–half-year circuitous path to sunitinib underscores its non-obviousness.  Ex. D, Sun Dem.  Sugen did not follow the purportedly clear path set forth in its own publications, as Mylan posits.  It took the inventors years of trial and error to synthesize sunitinib, and even then they did so as part of a program to design molecules *without* VEGFR activity.

53.     In 1995, Sugen identified a set of compounds for exploration, including SU5416. Tr. 645:22-647:2 (Sun).  SU5408, also synthesized at that time, garnered little attention.  *Id.* at 648:16-649:8.  SU5416 was flawed in significant ways, so Sugen set out to make a second generation compound to address those problems while broadening the activity against RTK targets.  Ex. 75a at 2; Tr. 651:20-652:16 (Sun).  After 18 months of research, Sugen synthesized and tested SU6668, which not only solved the problems with SU5416, but also had far better *in vivo* potency in tumor growth models.  Tr. 652:17-657:19 (Sun); Ex. 401; Ex. 632 at 2; Exs. 229-233, 235 (lab notebooks).  Where SU5416 merely delayed tumor growth, SU6668 also caused regression of large tumors, a profound discovery.  Tr. 657:21-658:11 (Sun); Ex. 91 at 5-6.

54.     With SU6668 in clinical trials, Sugen turned its focus to its separate "Pan-Her" program, targeting "EGFR" and seeking to *eliminate* VEGFR/anti-angiogenesis activity.  Tr. 661:7-662:10 (Sun).  Computer modeling suggested the use of basic side chains and amide substitutions on the pyrrole to hit the EGFR target selectively.  Tr. 662:11-666:7 (Sun); Ex. 15;

19

Liang Tr. 20:7-16.  Sugen also tried to increase EGFR activity with substitutions on the oxindole, including fluorine at C-5.  Tr. 664:23-665:10 (Sun).  Through this trial and error process, in April 1999, Sugen synthesized sunitinib with these substituents.  *Id.* at 666:8-667:9; Ex. 31 at 5; Liang Tr. 12:19-24.  None of these selections was made for the purposes proposed by Mylan, *i.e.,* metabolism and solubility, and all were part of a program to increase EGFR activity, while *eliminating* VEGFR activity.  Tr. 661:7-666:7 (Sun); Liang Tr. 20:7-20, 23:18-24:6, 24:16-25.

55.     Even the salt selection step was not obvious to the inventors.  The L-malate salt was tried "just for kicks."  Ex. 25 at 34; Hawley Tr. 87:19-89:1; Tr. 690:24-693:9 (Myerson).

*     *     *

56.     Dr. Denny, who did not work on anti-angiogenesis before the priority date, Tr. 190:9-191:8 (Denny), stitched together Mylan's theory entirely as matter of hindsight.  In considering potential leads, he improperly ignored impressive compounds disclosed by Sugen's competitors and failed to analyze the entire field, instead selecting suboptimal leads, one of which was never disclosed or tested in the art.  And he suggested that a precise and lengthy series of modifications was obvious even though no one had bothered to try any one of them in the nearly four years between the disclosure of SU5416 and the priority date.  In so doing, he disregarded key teachings in the art directing the POOS in different, often opposite, directions.

57.     Plaintiffs' experts, Drs. Lydon and Stafford, who worked in anti-angiogenesis at the time, performed comprehensive analyses that were consistent with the teachings of the art.  Tr. 302:17-304:25, 322:17-20, 324:24-325:10 (Lydon); Ex. 133 at 1-2; Tr. 452:24-459:12 (Stafford); Ex. 127 at 3.  Unlike Mylan, Plaintiffs also introduced testimony from a solid form selection expert regarding the L-malate salt.  Ex. 124; Tr. 677:24-679:19 (Myerson); Tr. 260:1-25 (Denny).  Plaintiffs' experts persuasively explained why it was not obvious to start with Mylan's leads and make the suite of changes needed to synthesize sunitinib L-malate.

20

**F.      Objective Indicia Support a Conclusion of Non-Obviousness.**

58.     Objective indicia strongly reinforce the non-obviousness of the claims at issue.

59.     **Unexpected *In Vitro* Properties.**  Sunitinib's profound and unexpected *in vitro*

potency paved the way for its tremendous success.  Ex. 116 at 2.  The potency of sunitinib

(compound 12b) and compounds 12c and 12f (also in claims 5 and 21 of the '293 patent) against

the targets was strikingly better than SU5416, SU6668, and SU5408, which are the closest prior

art compounds identified by Mylan.  Ex. C, Stafford Dem. 8; Ex. 112 at 7; Tr. 541:9-543:19

(Stafford).  The PDGFR activity of the claimed compounds was 500 to 10,000 times better than

SU5416 and SU5408, and as Dr. Denny conceded, as to the VEGFR, PDGFR, and FGFR targets

collectively, they were "certainly much more potent" than the prior art.  Tr. 542:16-543:19

(Stafford); Tr. 265:10-267:22 (Denny).  This unexpected potency is due to the unique structural

features of the compounds and would be the same in their L-malate forms.  Tr. 543:20-544:11

(Stafford).  The POOS would not have expected these remarkable properties.  *See* ¶¶ 25-48.

60.     **Unexpected Salt Properties.**  The POOS would not have expected that the L-

malate salt of sunitinib would have such favorable properties, surpassing all thirteen other salts

tested; the POOS would have expected that it would be inferior in some way.  Tr. 696:12-697:1

(Myerson); Ex. 45 at 10; Ex. 47 at 10.  It was also unexpected that it would solve the "horrible"

filtration manufacturability problem with the free base of sunitinib.  Tr. 692:7-696:10 (Myerson);

Tr. 179:12-180:6, 264:19-25 (Denny); Ex. 298 at 1, 6; Hawley Tr. 71:25-72:10, 123:25-125:6.

61.     **Clinical Objective Indicia of Non-Obviousness.**  Sutent® revolutionized the

treatment of renal cell carcinoma ("RCC") and pancreatic neuroendocrine tumors ("PNET").[4]

---

[4] Plaintiffs' experts, Drs. Bukowski and Kulke, specialize in treating RCC and PNET patients.
Tr. 714:8-13 (Bukowski); 782:4-783:2 (Kulke); Ex. 134 at 5; Ex. 130 at 20-21.  By contrast,
Mylan's expert, Dr. Ratain, rarely treats patients with those diseases.  Tr. 993:11-995:19 (Ratain).

62.     In October 2000, there was a long-felt "urgent need" for tolerable RCC and PNET therapies that extended and improved patients' lives.  Ex. 454 at 1, 7; Tr. 718:22-724:5, 753:20-754:1 (Bukowski); Tr. 987:19-22, 988:25-989:3 (Ratain); Tr. 784:24-788:7, 797:23-798:10 (Kulke); Ex. 505 at 2; Ex. 489 at 4; Ex. 329 at 1.  The median survival time after diagnosis with metastatic RCC was 10-12 months, and treatments were ineffective or associated with toxicities that Mylan's expert described as "life-threatening, if not fatal."  Tr. 996:4-997:7 (Ratain); Tr. 720:2-722:6 (Bukowski); Ex. 1015 at 2; Ex. 847 at MYL0096738-39.  The one approved PNET therapy provided only modest benefits and was virtually intolerable.  Tr. 784:24-786:9 (Kulke); 997:16-1000:2 (Ratain); Ex. 329 at 6.  Patients with RCC or PNET regularly enrolled in clinical trials, but to no avail.  Tr. 720:2-724:20 ("[I]f you want to show a new drug to fail, test it in kidney cancer") (Bukowski); 784:24-788:20 (Kulke).

63.     There was skepticism that anti-angiogenic agents could meet the needs in RCC and PNET.  The contemporaneous literature estimated "the chance of an anti-angiogenic agent moving into standard medical practice . . . to be in the order of 1:10 000" for any cancer.  Ex. 464 at 3; Tr. 317:14-321:13 (Lydon).  And even where a drug treated other cancers, the POOS still would have expected that it would not treat RCC or PNET given the long history of clinical failures in those diseases.  Tr. 788:-20 (Kulke); Tr. 724:6-20 (Bukowski); Ex. 532 at 1 (72 agents tested in RCC had "marginal efficacy at best").  PNET specialists were so dubious of Sutent®'s phase I clinical trial results that they requested verification to confirm that the neuroendocrine patients had not been misdiagnosed.  Tr. 788:24-790:6 (Kulke); Ex. 379.

64.     There was also significant skepticism about sunitinib because its exceptionally broad target profile raised toxicity concerns.  Tr. 545:16-547:7 (Stafford); Tr. 670:21-672:4 (Sun); Tr. 391:4-393:2 (Lydon); Ex. 738 at xxiii; Ex. 903 at 2.  For this reason, sunitinib was

"controversial," Ex. 75a at 2, and executives at Pharmacia and Glaxo doubted it would work.  Tr. 671:20-672:7 (Sun); Tr. 546:12-18 (Stafford); Liang Tr. 129:19-130:25; Ex. 708 at LI 039.

65.     The POOS would not have believed that sunitinib would succeed simply because SU5416 and SU6668 had made it to the clinic.  They are different compounds and most drugs in the clinic fail.  Tr. 724:21-729:7 (Bukowski); Tr. 1008:11-21 (Ratain); 315:24-316:7 (Lydon); Ex. 89 at 2, Table 1.  Even Dr. Ratain acknowledged that substantial test data on a drug is necessary for the POOS to expect that it may be a useful cancer treatment or to conclude that its ability to treat cancer would not be unexpected, Tr. 1004:5-24, 1005:20-1006:2, 1006:9-20, 1007:16-1008:3, 1014:8-15 (Ratain), and no such data was available in October 2000 for sunitinib, Tr. 1003:6-9 (Ratain).  The expert clinicians agreed that that Sutent®'s efficacy in treating RCC and PNET would not have been expected in October 2000.  Tr. 1006:9-20 (Ratain); Tr. 724:6-20 (Bukowski); Tr. 788:8-20 (Kulke).

66.     Now approved for the treatment of three types of cancer, Sutent® has been a "welcome and sorely needed addition to the oncologist's armamentarium." Ex. 524 at 1. Although there is still no cure for these patients, Sutent® satisfied the need for significantly improved treatments for RCC and PNET.  Tr. 730:6-13, 739:7-740:7, 745:14-23 (Bukowski); Tr. 792:21-793:13 (Kulke); Tr. 997:8-15, 1000:24-1001:16 (Ratain).  It *doubled* the overall survival of patients with RCC and produced "unprecedented" tumor shrinkage in the majority of patients. Tr. 741:9-743:8, 732:18-733:12 (Bukowski); Ex. 99; Ex. 454 at 2, 5.  Sutent® has provided clinical benefits "never seen before in kidney cancer."  Tr. 746:2-12 (Bukowski).  It has also significantly slowed tumor growth in PNET patients with tolerability far superior to prior art therapies, representing "a huge paradigm shift."  Tr. 790:24-793:13 (Kulke); Ex. 487.

67.     Sutent® has been met with acceptance and praise from oncologists and patients who had long hoped for a therapy with its clinical properties.  Tr. 746:2-747:8, 754:2-11 (Bukowski); Tr. 791:15-20 (Kulke); Ex. 524 at 1; Ex. 505 at 1.  That a handful of other drugs developed after the priority date have also improved oncologists' ability to treat these patients does not detract from the tremendous benefits achieved by Sutent®.  Tr. 736:25-739:13, 745:14-746:1, 751:12-752:2 (Bukowski); Tr. 792:7-20 (Kulke); Tr. 1001:17-1002:18 (Ratain); Ex. 640.

68.     In the years leading up to October 2000, other researchers actively sought to develop anti-angiogenesis cancer treatments with sunitinib's properties and failed "all along the way."  Tr. 544:12-19 (Stafford).  A number of other companies even worked with and patented oxindole compounds after SU5416.  Tr. 267:23-269:6 (Denny).  Yet, no other scientists made sunitinib, despite the fact that it was not covered by blocking patents.  *Id.*; Tr. 544:12-545:13 (Stafford); *supra* n.3.  These factors strongly support a finding of non-obviousness.

69.     **Commercial Success.**  Sutent® has been an extraordinary commercial success.  It achieved over $1 billion in sales globally in each of 2010 and 2011, and total global sales of over $5.7 billion.  Ex. 602; Ex. 634 at 3; Ex. 135; Tr. 860:17-861:18 (Nicholson).  Its total U.S. sales through the end of 2011 were over $1.5 billion.  Ex. 618; Tr. 860:13-16 (Nicholson).

70.     Sutent® immediately became the dominant drug among advanced RCC medications, where it is principally a first-line treatment.  Tr. 809:16-19 (Robertson); Tr. 860:4-12; 862:1-19 (Nicholson); Ex. 620.  In its first year, it captured 94% of U.S. sales for first-line RCC treatments, even though a competitor launched first.  Ex. 620; Tr. 863:10-864:13 (Nicholson).  Sutent® continues to hold the highest market share by revenue and prescriptions, occupying roughly half of the first-line RCC market—about twice as much as the closest competitor.  Ex. 620; Tr. 864:5-867:3 (Nicholson).

24

71.     Sutent®'s earnings have exceeded expenses each year that it has been sold, and it has exceeded expectations.  Tr. 813:20-22 (Robertson).  Pfizer's "optimistic" projection in 2005 (immediately prior to launch) had Sutent® achieving peak worldwide sales of about $800 million in 2020, a target it has surpassed since 2009.  Ex. 788 at 15; Tr. 813:23-822:24 (Robertson).  And Sutent® has earned a cumulative profit of $1.5 billion through 2011, based on global sales.  Tr. 867:10-872:12 (Nicholson); Ex. 624; Ex. 393 at 3, 5.  Even under Dr. Gering's erroneous U.S.-only analysis, Sutent® would break even in its tenth year, long before the 15-16 year average (with global sales) for other drugs.  Tr. 872:13-873:7 (Nicholson); Ex. 394 at 6.

72.     The commercial success of Sutent® is attributable to the properties of the claimed compound, sunitinib L-malate, that make it an effective and tolerable cancer treatment.  Tr. 738:16-739:6, 752:15-753:19 (Bukowski).  It has not achieved its remarkable success through advertisements or marketing expenditures, which are "in line with or lower than its RCC competitors."  Tr. 874:24-875:20 (Nicholson); Ex. 622.

## PROPOSED CONCLUSIONS OF LAW

### I.     BACKGROUND

73.     An issued patent claim is presumed valid.  35 U.S.C. § 282.  To overcome that presumption, "[e]ach fact . . . regarding the obviousness of the claimed subject matter as a whole must be established by clear and convincing evidence."  *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 292 (Fed. Cir. 1985).  As Mylan's arguments are based on art considered during prosecution, Mylan's proof must "overcom[e] the deference that is due to" the Patent Office.  *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012); FOF ¶ 1.

## II.     THE CLAIMED INVENTION IS NOT OBVIOUS.

### A.     The POOS Would Not Have Selected Mylan's Compounds as Leads.

74.     In assessing whether a new chemical compound would have been obvious under 35 U.S.C. § 103, a court first determines "whether a chemist of ordinary skill would have selected the asserted prior art compounds as lead compounds, or starting points, for further development." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1291 (Fed. Cir. 2012), *cert. denied*, 2013 WL 141191 (U.S. Jan. 14, 2013); *accord Daiichi Sankyo Co. v. Matrix Labs., Ltd.*, 619 F.3d 1346, 1352 (Fed. Cir. 2010).  A finding that the POOS would not have started with the asserted lead compound precludes a conclusion of obviousness. *Takeda Chem. Indus. v. Alphapharm Pty.*, *Ltd.*, 492 F.3d 1350, 1357-62 (Fed. Cir. 2007); *Daiichi*, 619 F.3d at 1354.

75.     The identification of a lead compound involves a relative comparison among prior art compounds to determine which "would be most promising to modify in order to improve upon its . . . activity and obtain a compound with better activity." *Otsuka*, 678 F.3d at 1291; *see Bone Care Int'l., L.L.C. v. Roxane Labs., Inc.*, 2012 WL 2126896, at *45 (D. Del. June 11, 2012).  This choice is guided by "knowledge in the art of the functional properties and limitations of the prior art compounds," *Daiichi*, 619 F.3d at 1354, including "positive attributes such as activity and potency, adverse effects such as toxicity, and other relevant characteristics," *Otsuka*, 678 F.3d at 1292, such as route of administration, metabolism and clearance. *See Daiichi*, 619 F.3d at 1353; *Merck Sharp & Dohme Pharms., Srl. v. Teva Pharm. USA, Inc.*, 2009 WL 3153316, at *19 (D.N.J. Aug. 19, 2009).  "Potent and promising activity . . .  trumps mere structural relationships." *Daiichi*, 619 F.3d at 1354; *Merck*, 2009 WL 3153316, at *49.

76.     The POOS would not have selected the compounds proposed by Mylan as leads in October 2000.  First, SU5416 would not have been a lead compound by October 2000.  Although it was a well-known clinical candidate, it suffered from a number of serious defects.

26

FOF ¶¶ 6-7, 17-18.  By October 2000, newer compounds with a variety of core structures had emerged that had solved each of these problems, far surpassed the potency of SU5416 against the targets, and had superior *in vivo* profiles.  FOF ¶¶ 7-18.  Consistent with *Otsuka*, where the Federal Circuit held that the "only carbostyril derivative tested in humans" would not have been a lead because its properties were inferior to newer, less developed alternatives, SU5416 would not have been a lead in October 2000.  678 F.3d at 1289-90, 1295-96.

77.     SU5408 also would not have qualified as a lead.  There was scant data on the compound and by October 2000 it had been eclipsed by dozens of other oxindoles and non-oxindoles.  FOF ¶¶ 6-16, 19-20.   Mylan attempts to freeze the art in 1998, disregarding progress in the field up to October 2000.  That is legally improper.  *See Otsuka*, 678 F.3d at 1295-96; *Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999) (leads analyzed as of priority date).  Similarly, it was improper for Mylan's expert not to consider potential leads from alternative compound classes.  *See Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 2001 WL 1397304, at *10-11 (S.D. Ind. Oct. 29, 2001); *Daiichi*, 619 F.3d at 1353-54.

78.     Mylan's third "lead," the hypothetical '422 compound, was not even disclosed in the prior art.  FOF ¶¶ 21-23.  A genus of compounds, like the possible combinations of precursors in the '422 application, is not deemed to disclose all of its species unless it is so limited that the POOS could "at once envisage" each compound therein.  *In re Petering*, 301 F.2d 676, 681-82 (C.C.P.A. 1962).  The reference "must clearly and unequivocally disclose the claimed compound or direct [a POOS] to the compound without *any* need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference."  *In re Arkley*, 455 F.2d 586, 587-88 (C.C.P.A. 1972); *see also Sanofi-Synthelabo v. Apotex Inc.*, 492 F. Supp. 2d 353, 384 (S.D.N.Y. 2007), *aff'd*, 550 F.3d 1075 (Fed. Cir. 2008).

27

79.     The hypothetical '422 compound is not identified by "blaze marks," *In re Ruschig*, 379 F.2d 990, 993-96 (C.C.P.A. 1967), does not belong to a "small recognizable class with common properties," *In re Ruschig*, 343 F.2d 965, 974 (C.C.P.A. 1965), and is not "specific[ally] prefer[red]," *Sanofi-Synthelabo*, 550 F.3d at 1084.  It is one of approximately 1,200 compounds that could result, and it is not depicted, discussed or singled out in any way. FOF ¶¶ 21-23.  *See Eli Lilly & Co. v. Zenith Goldline Pharm.*, 471 F.3d 1369, 1376 (Fed. Cir. 2006).  Courts have found no disclosure from among far smaller genuses.  *See, e.g.*, *Impax Labs., Inc. v. Aventis Pharm. Inc.*, 468 F.3d 1366, 1383 (Fed. Cir. 2006) (hundreds of compounds); *In re Ruschig*, 343 F.2d at 974 (130, 156 and 259 compounds).  This compound was not disclosed in the prior art, and so it cannot serve as the basis for an obviousness challenge.

80.     More importantly, there was absolutely nothing known about the hypothetical '422 compound in the prior art, let alone anything that would have made it a lead compound. FOF ¶ 23.  In the chemical arts, data is critical in choosing a lead.  *Otsuka*, 678 F.3d at 1293-94. Here, absolutely no test data had been reported on the hypothetical '422 compound and the POOS would have had no basis to conclude that it was "promising" at all, much less among the *most* promising compounds.  *Takeda*, 492 F.3d at 1357.  Given the highly unpredictable nature of this art, the POOS would not have expected this compound to have promising activity based on a set of highly tenuous assumptions about its never-tested substituents.  FOF ¶¶ 21-23, 44-48. Mylan's selection of the hypothetical '422 compound as a lead is pure hindsight.

81.     In sum, the POOS would not have started with any of the compounds that Mylan identifies as leads and the asserted claims therefore cannot have been obvious.

### B.     The POOS Would Not Have Made the Modifications Mylan Proposes.

82.     Mylan also has not come close to proving that the POOS would have had reason to modify these compounds as proposed.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420

(2007).  In this highly unpredictable, infinitely broad art, Mylan's theory of obviousness requires the POOS to have made no fewer than six specific, independent decisions to arrive at sunitinib from SU5416 (five from SU5408): (1) selecting or adding the 4'-ester to the pyrrole ring to have an electron-withdrawing side chain; (2) replacing the ester with an amide; (3) adding a two-carbon linker to the amide; (4) adding a diethylamine to the linker; (5) adding a 5-fluorine to the oxindole core; and (6) retaining both the C-3' and C-5' methyls.  FOF ¶¶ 24-40, 43.  In proposing this path, Mylan violates the fundamental tenet forbidding parties from using hindsight to construct an obviousness case.  *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008).

83.     The Federal Circuit has rejected far simpler obviousness theories and has never found a compound obvious on the basis of so many modifications.  In *Eli Lilly v. Zenith*, the modification of a *single atom*—replacing a hydrogen with a fluorine—was non-obvious because the prior art did not suggest that the modification would improve properties.  471 F.3d at 1378. In *Daiichi*, the court rejected Mylan's argument that the difference of "only a single oxygen atom," was a "minor" modification, finding instead that it was substantial and non-obvious because it was "the difference between functional groups."  619 F.3d at 1350-51, 1356 & n.4. Similarly, in both *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.* and *Eisai Co. v. Dr. Reddy's Laboratories Ltd.*, replacing one functional group on a molecule rendered the compound non-obvious.  689 F.3d 1368, 1377-78 (Fed. Cir. 2012); 533 F.3d 1353, 1357-59 (Fed. Cir. 2008).  Another seemingly simple change, moving the same functional group to a different position on a molecule, has also been repeatedly held non-obvious.  *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 995-96 (Fed. Cir. 2009); *Takeda*, 492 F.3d at 1361.

84.     Mylan's "path" to sunitinib begins with a series of purported "problems" that it asserts would have guided the POOS's modifications.  While "any need or problem known in the field . . . can provide a reason for combining the elements in the manner claimed," *KSR*, 550 U.S. at 420, the problem driving the modification must be one the POOS actually would have recognized at the time.  *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 (Fed. Cir. 2000); *Source Search Techs. LLC v. LendingTree, LLC*, 588 F.3d 1063, 1073 (Fed. Cir. 2009).

85.     Even where a problem is recognized, Mylan must "identify some reason that would have led a chemist to modify" the prior art "in a particular manner."  *Procter & Gamble Co.*, 566 F.3d at 996.  Where there are "many opportunities for modification," the challenger must prove that a specific change "was the one, among all the possibilities, that would have been successfully pursued."  *Eli Lilly*, 689 F.3d at 1378; *Takeda*, 492 F.3d at 1357.  The question is not whether a modification would be "feasible" but whether it would have been "desirable," *Winner*, 202 F.3d at 1342-44, 1349, and pursued over other options, *Eli Lilly*, 471 F.3d at 1379-80.

86.     In assessing obviousness, the court must consider whether the art teaches away from the claimed invention, *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1374-75 (Fed. Cir. 2011), *cert. denied*, 133 S. Ct. 97 (2012), because "[a]n inference of non-obviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a person of ordinary skill would have combined the known elements," *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009); *see also In re Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986).  In the chemical arts, where the art teaches a preference in one direction, it effectively teaches away from other directions.  *Eli Lilly*, 471 F.3d at 1378; *Daiichi*, 619 F.3d at 1354-57.

87.    Here, Mylan has not met its burden of proving that the POOS would have had reason to make any of its proposed modifications, all of which the art taught away from.

88.    **Selection of an Electron-Withdrawing Ester.**  Mylan's theory falls apart immediately because there was an indisputable trend in the art by October 2000 in favor of electron-*donating* substitutions on the pyrrole ring, and away from electron-*withdrawing* groups, like esters.  FOF ¶¶ 25-29.  Every oxindole publication after Sun 1998 underscored the importance of acidic side chains on the pyrrole, providing both crystallographic and SAR justifications.  *None* described, much less promoted, compounds with electron-withdrawing substitutions.  *Id.*  This clear preference in the opposite direction from Mylan's modification defeats obviousness.  *See Daiichi*, 619 F.3d at 1354-57 (not obvious to add hydrophilic group where clear preference for opposite lipophilic group); *Eli Lilly*, 471 F.3d at 1378 (not obvious to add electron-donating group where clear preference for opposite electron-withdrawing group); *In re Rosuvastatin Calcium Patent Litig.*, 2012 WL 6217356, at *3-4, (Fed. Cir. Dec. 14, 2012).

89.    **Modification to an Amide.**  Mylan next posits that the POOS, having just selected the ester for its potency, would immediately change it to a different functional group that had never been tested in the art—an amide—due to a theoretical hydrolysis concern.  The prior art does not describe any hydrolysis concern with these structures, and there was no data suggesting that this was a problem for these compounds.  FOF ¶¶ 30-31.  The record provides "no discernible reason for a skilled artisan to begin with [a compound] only to drop the very feature . . . that gave [it an] advantageous property."  *Eisai*, 533 F.3d at 1358.

90.    Mylan's argument is particularly unpersuasive given that amides can be hydrolyzed as rapidly as esters.  FOF ¶ 31.  It is not obvious to try to solve a problem by swapping in a substituent with the very same problem.  *Takeda*, 492 F.3d at 1360.  Instead, if the

31

POOS were concerned about hydrolysis, the POOS would plainly have favored the dozens of alternative groups that were not subject to hydrolysis.  FOF ¶ 31; *see Eli Lilly*, 689 F.3d at 1378.

91.     **Addition of Diethylamine and 2-Carbon Linker.**  Mylan next proposes that the POOS would have had reason to add a solubilizing group to the amide.  However, Mylan has not met its burden of proving that the POOS would have expected the compound with the amide to have a solubility problem; rather, it would already be within the desired solubility range.  FOF ¶ 32.  Moreover, if a solubilizing group were considered, the prior art taught away from employing a basic side chain, like an amine, in view of the clear trend in the art toward acidic side chains, which Sugen had been employing with great success.  FOF ¶ 33; *see Daiichi*, 619 F.3d at 1354-57; *Eli Lilly*, 471 F.3d at 1378; *In re Rosuvastatin*, 2012 WL 6217356, at *3-4.  Not only would the propionic acid substitutions have addressed any solubility concerns, but the prior art taught that they were "*required*" for potency.  Ex. 113 at 7; Ex. 114 at 6; FOF ¶¶ 26, 28, 33.

92.     The POOS could have chosen from among hundreds of solubilizing chains and could have placed them almost anywhere on the molecule to improve solubility.  FOF ¶¶ 33-34.  The record reflects no particular reason to select the diethylamine, which was nowhere disclosed or tested in the oxindole-pyrrole art.  *Id*.

93.     Nor has Mylan demonstrated that the POOS would have attached that amine to the amide with a two-carbon linker, as opposed to a longer one, when the prior art taught multiple 3-carbon linkers that were highly active.  FOF ¶ 35.

94.     **Addition of C-5 Fluorine.**  Continuing along its hindsight-laden path, Mylan insists that the POOS would have placed a fluorine at the C-5 position to solve a metabolism "problem" that the art described as "minor."  FOF ¶¶ 36-37.  Mylan did not prove that the POOS would have acted to address this "minor" metabolism or even considered it a problem.  Sugen

32

appeared entirely unconcerned about it, advancing a "prototype" compound and a clinical candidate with no substitution at this position.  FOF ¶ 37; *see Janssen Pharmaceutica N.V. v. Mylan Pharm., Inc.*, 456 F. Supp. 2d 644, 665 (D.N.J. October 13, 2006) (POOS would not have perceived "problem requiring a modification of its molecular structure").

95.     In any event, the art does not provide a reason for solving this problem with a fluorine—a substituent that had never been depicted or tested at C-5—as opposed to any number of other substituents that were expressly preferred such as small electron-donating groups or large hydrophilic groups.  FOF ¶ 38; *Takeda*, 492 F.3d at 1360.  To the contrary, the Sun 1998 reference taught away from employing electron-withdrawing or lipophilic groups (fluorine is both) at the C-5 position given detrimental effects on potency.  FOF ¶¶ 38-40; *see Eli Lilly*, 471 F.3d at 1375; *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 364 F. Supp. 2d 820, 905 (S.D. Ind. 2005) ("In view of the necessity of maintaining activity, replacing the fluorine atom with a hydrogen atom would not have been the obvious choice."), *aff'd*, 471 F.3d 1369 (Fed. Cir. 2006). Even absent the teach-aways, the prior art "simply does not provide a reason to make such a modification." *Daiichi*, 619 F.3d at 1356.

96.     **Replacing the Two Methyls with Ethyls in the Hypothetical '422 Compound.** The POOS would not have replaced the two methyls of the dimethylamine of the hypothetical '422 compound with two ethyls to address a theoretical "dealkylation" issue.  Given the numerous commercial drugs with dimethylamine groups, the POOS would not have been concerned about dealkylation absent data suggesting a problem.  FOF ¶ 42.  In any event, here again Mylan proposes to "fix" a purported problem by introducing a new substituent subject to the same problem.  *Id.*  This is neither obvious nor rational.  *Takeda*, 492 F.3d at 1360.

97.     Countless analogues of the hypothetical '422 compound could have been made; there was no reason—apart from hindsight—to replace the two methyls with two ethyls as Mylan proposes.  Courts have previously rejected arguments that changing methyl groups to ethyl groups was obvious.  *Takeda*, 492 F.3d at 1360; *see Eli Lilly*, 471 F.3d at 1378.  This modification would not have been obvious.

98.     **Retaining the C-3' and C-5' Methyls.** Mylan focuses exclusively on modifications that would have led to sunitinib, but there were numerous alternative, often more attractive modifications that would have led the POOS in different directions.  Notably, Mylan assumes that the POOS would have retained the C-3' and C-5' methyls on the proposed lead structures.  But the evidence demonstrates that the most potent oxindoles described in the art by October 2000 did not retain these methyls, and potency and metabolism concerns would have motivated the POOS to consider modifying them.  FOF ¶ 43; *See Tec Air, Inc.*, 192 F.3d at 1360. This further undermines Mylan's argument that the art would have led the POOS to sunitinib.

*        *        *

99.     Mylan has failed to show by clear and convincing evidence that each of its proposed modifications would have been one of the very few *best* alternatives to solve a *recognized* problem.  *Eli Lilly*, 689 F.3d at 1378; *Takeda*, 492 F.3d at 1356-57; *Source Search*, 588 F.3d at 1073.  The art not only taught away from each of the individual substitutions Mylan proposed, but also provided a litany of alternative options that would have been more attractive to the POOS.  Moreover, Mylan has failed to identify any teaching that would have prompted the POOS to choose the specific collection of substitutions it proposes over the countless alternative sets of substitutions available.  There is no evidence—let alone clear and convincing evidence— that it would have been obvious to the POOS to follow the "precise steps" leading to the

34

"remarkable invention" here, sunitinib. *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1345 (Fed. Cir. 2000).   This precludes a finding of obviousness. *Id.*

### C.     The POOS Would Not Have Had Reasonable Expectation of Success.

100.     Mylan must prove that each of its plethora of modifications would have been made with a reasonable expectation that the new compound "would have similar or improved properties compared with the old." *Daiichi,* 619 F.3d at 1352.  Given that the goal was to design a compound that would be a potent angiogenesis inhibitor for treating cancer, proving that the POOS would have expected the compound to have improved solubility and metabolism properties is insufficient.  Mylan must prove, among other things, that the POOS would have had a reasonable expectation of improving the potency of the molecule—or at least retaining it.

101.     In *Yamanouchi*, the Federal Circuit rejected the argument that a modification would be obvious if it could be expected merely to result in a "baseline level" of activity because "success was finding a compound that had high activity, few side effects, and lacked toxicity." 231 F.3d at 1345.  In *Eli Lilly v. Zenith*, the court found that "a reasonable expectation" regarding one property—"a high level of H2 antagonist activity"—would "fall far short of what a researcher needed to expect success with a new compound" because the POOS "would have been looking for a compound that showed not only" such activity, "but also many other critical properties," including "the absence of dangerous side effects, the ability to be taken orally, the duration of the action . . . , [and] the absence of toxicity."  2001 WL 1397304, at *9.

102.     Mylan has not come close to demonstrating that the POOS would have had a reasonable expectation of preserving, much less improving, potency.  FOF ¶¶ 44-48.   It has long been recognized that "[s]mall changes in chemical structure may have dramatic and unpredictable biological effects," *Eli Lilly*, 2001 WL 1397304, at *14, and the prior art here illustrates this principle emphatically.  FOF ¶¶ 45-46.  Mylan proposes numerous, substantial

35

modifications, and there are no test results reporting on the impact of any one of them.  The cumulative effect of these changes could not possibly have been predicted.  This defeats the obviousness argument.  *See Janssen,* 456 F. Supp. 2d at 664-666 ("compound modification is an uncertain process that can easily result in reduced efficacy or safety issues").  As with other chemical cases, this is not a case of a "finite number of predictable solutions." *Eisai*, 533 F.3d at 1359 (quoting *KSR*, 550 U.S. at 421).

### D.      The L-Malate Salt Form of Sunitinib Would Not Have Been Obvious.

103.     Mylan appears to argue that it was "obvious to try" malate because it appeared in a list that identified salt forms used in FDA approved products—albeit the outdated 1974 list. FOF ¶ 50.  But this too is not a case of "a finite number of identified, predictable solutions" to a problem.  *See KSR*, 550 U.S. at 421.  Malate is among the rarest salt forms ever used.  It did not appear in the most current FDA list available in October 2000, and if the POOS had looked beyond the list, there were hundreds of other salt options.  FOF ¶ 50; *Valeant Int'l v. Watson Pharm., Inc.*, 2011 WL 6792653, at *8 (S.D. Fla. Nov. 8, 2011) (improper to rely "on the outdated 1986 version" of the list).  Furthermore, whether a salt will form and what its properties would be are highly unpredictable.  FOF ¶ 49; *Sanofi-Synthelabo*, 492 F. Supp. 2d at 373-74 (S.D.N.Y. 2007); *accord Sanofi-Synthelabo* 550 F.3d 1075 (Fed. Cir. 2008).

104.     Even if, contrary to the evidence, the POOS had looked to the 26-year-old list, the POOS would have only tried a handful of salts, FOF ¶ 50, and Mylan failed to identify any teaching toward the malate.  In *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007), the Federal Circuit reversed a finding that a particular salt form was non-obvious because there was a specific suggestion that the salt would "offer improved stability in the particular compound at issue."  *Id.* at 1348.  By contrast, in this case, as in *Sanofi-Synthelabo*, Mylan has not offered any reason for the POOS to select L-malate.  550 F.3d at 1088-89 (distinguishing *Pfizer v. Apotex*).

105.    Also, given the unpredictability of this field, Mylan has not met its burden of proving that the POOS would have reasonably expected that the L-malate salt of sunitinib would form and would have acceptable properties.  FOF ¶ 49.

### E.    The Inventors' Path Confirms that the Invention Was Not Obvious.

106.    The history of the invention of sunitinib—as part of a project designed to target entirely different RTKs, and not as part of Sugen's long quest to improve on SU5416—confirms that Mylan's path to sunitinib through Sugen's own art would have been far from obvious to the POOS.  FOF ¶¶ 52-55.  While "[p]atentability shall not be negatived by the manner in which the invention was made," 35 U.S.C. § 103(a), the inventors' own extensive struggles and efforts to arrive at the invention are probative of non-obviousness.  *See, e.g.*, *Micro Chem., Inc. v. Great Plains Chem. Co.*, 103 F.3d 1538, 1547 (Fed. Cir. 1997) (inventor's "extensive efforts to solve the problem" relevant); *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988) (years of research by the patentee "entitled to fair evidentiary weight").

### F.    Objective Indicia Support a Conclusion of Non-Obviousness.

107.    **Unexpected Properties.**    Evidence of significant unexpected properties, as here, can single-handedly establish non-obviousness.  *Procter & Gamble*, 566 F.3d at 994.

108.    Sunitinib and other claimed compounds are substantially more potent against the VEGFR, PDGFR, and FGFR targets than the prior art compounds, 10 to over 1000-fold depending on the target and assay.  *See* FOF ¶ 59.  In this highly unpredictable art, without the benefit of any testing regarding the chemical groups added to make sunitinib, the POOS would not have reasonably expected that sunitinib would retain the potency of the prior art compounds, much less far surpass it.  *See* FOF ¶¶ 44-48, 59.  Such unexpected increases support a conclusion of non-obviousness.  *See Daiichi Sankyo Co. v. Mylan Pharm. Inc.*, 670 F. Supp. 2d 359, 382-83

(D.N.J. 2009), *aff'd*, 619 F.3d 1356 (Fed. Cir. 2010); *Proctor & Gamble Co. v. Teva Pharm.*

*USA, Inc.*, 536 F. Supp. 2d 476, 495-96 (D. Del. 2008), *aff'd*, 566 F.3d 989 (Fed. Cir. 2009).

109.     The L-malate salt form of sunitinib unexpectedly overcame the very significant

manufacturability problems of the free base form, filtering over 300 times faster.  It is also

unexpectedly superior, by every metric, to every other form of sunitinib tested.  *See* FOF ¶ 60;

*Sanofi-Synthelabo*, 492 F. Supp. 2d at 373-74.

110.     Finally, Sutent® has revolutionized the treatment of RCC and PNET, although

the POOS would have expected it to be ineffective.  FOF ¶¶ 61-66.  It has doubled the survival

rate of RCC patients and significantly slowed tumor growth in PNET patients.  FOF ¶ 66.

Unexpected clinical efficacy is strong evidence of non-obviousness, even where no method of

treatment claim is asserted because "[f]rom the standpoint of patent law, a compound and all of

its properties are inseparable; they are one and the same thing."  *In re Papesch*, 315 F.2d 381,

391 (C.C.P.A. 1963) (error not to consider the therapeutic properties of the claimed compounds);

*Eli Lilly*, 689 F.3d at 1381 ("unexpected clinical properties" relevant to compound claim).

111.     **Long-Felt Need.**  The evidence is overwhelming that Sutent® satisfied a long-

felt, but unmet need for improved treatments for RCC and PNET that existed as of October 2000,

further supporting non-obviousness.  FOF ¶¶ 62, 66-67; *Procter & Gamble*, 566 F.3d at 998.  It

is well-settled that a drug need not cure a disease to meet a long-standing need.  *See Eli Lilly &*

*Co. v. Sicor Pharm., Inc.*, 705 F. Supp. 2d 971, 1008 (S.D. Ind. 2010) ("the first drug in thirty

years to produce an improvement in overall survival" met need), *aff'd*, 426 F. App'x 892 (Fed.

Cir. 2011); *see also Pfizer Inc. v. Teva Pharm. U.S.A., Inc.*, -- F. Supp. 2d --, 2012 WL 2951367,

at *25, n.27 (D. Del. July 19, 2012) (Sleet, C. J.).  It is also of no moment that Nexavar® was

approved just weeks before Sutent® or that other drugs have since entered the market, given that

Sutent®'s therapeutic contribution has been significant and lasting.  *See, e.g.*, *Procter & Gamble*, 566 F.3d at 998 (rejecting argument that because competing drug became available first, claimed drug could not have satisfied long-felt need); *Eli Lilly*, 364 F. Supp. 2d at 852.

112.   **Failure of Others.**  For decades, both before and after the priority date, researchers tried and failed to develop tolerable and effective therapies for RCC and PNET.  FOF ¶¶ 62-63.  Similarly, at least eight other companies working with oxindoles before the priority date failed to develop a successful oxindole anti-angiogenesis agent and failed to discover sunitinib.  FOF ¶ 68.  These failures support a finding of non-obviousness.  *See, e.g.*, *Eli Lilly*, 364 F. Supp. 2d at 852; *In re '318 Patent Infringement Litig.*, 578 F. Supp. 2d 711, 732 (D. Del. 2008), *aff'd*, 583 F.3d 1317 (Fed. Cir. 2009); *Eli Lilly*, 2001 WL 1397304, at *14.

113.   **Commercial Success.**  Sutent® has met every traditional metric of commercial success for a pharmaceutical product:  significant revenues, high market share and rapid growth. *Procter & Gamble*, 566 F.3d at 998.  With over $1 billion in sales annually, $5.7 billion in global sales since launch, and $1.5 billion in domestic sales, it easily qualifies as a commercial success. FOF ¶ 69; *see Eisai*, 533 F.3d at 1356 (over $1 billion worldwide annually); *Eli Lilly*, 705 F. Supp. 2d at 1009 (same); *In re Alfuzosin Hydrochloride Patent Litig.*, 2010 WL 1956287, at *7 (D. Del. May 14, 2010) (less than $1 billion total).[5]  It rapidly gained market share and has maintained the highest share of its markets since its launch.  FOF ¶ 70; *see Ortho-McNeil Pharm., Inc. v. Teva Pharm. Indus.*, 344 F. App'x 595, 596 (Fed. Cir. 2009) (fastest growing prescription pain reliever); *Takeda*, 492 F.3d at 1352-53 (gained 47% of the market).  Even using a less traditional profitability metric, despite its limitations, *Daiichi*, 670 F. Supp. 2d at 386, Sutent® has been extremely profitable and exceeded expectations.  FOF ¶ 71.

---

[5]  It is error not to consider evidence of global sales if it is proffered.  *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1461 (Fed. Cir. 1984).

114.     It is undisputed that Sutent®'s success is a direct result of its active ingredient, the claimed compound, and not its marketing.  FOF ¶ 72.  In any event, nexus with the asserted claims is presumed here, where Sutent® is the commercial embodiment of the claims-in-suit and is coextensive with them, and Mylan has not rebutted that presumption.  *Eli Lilly*, 364 F. Supp. 2d at 907; *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).  There were no blocking patents that would diminish the evidence of commercial success. FOF ¶ 68.  The commercial success of Sutent® is significant evidence that the invention would not have been obvious, and it should be given great weight.  *Demaco*, 851 F.2d at 1391.

115.     **Skepticism.**  Sunitinib overcame substantial skepticism, including serious doubts in the field about whether an anti-angiogenesis agent would effectively treat cancer, whether any new drug would be found to treat RCC and PNET, and whether an RTK inhibitor with sunitinib's very non-selective profile would be effective without excessive toxicities.  FOF ¶¶ 63-64.  This skepticism is probative of non-obviousness.  *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1367, 1370 (Fed. Cir. 2012); *In re '318*, 578 F. Supp. 2d at 732. Evidence of "an almost insurmountable failure rate for new drug candidates," as presented in this case, establishes skepticism and supports non-obviousness.  *OSI Pharm., Inc. v. Mylan Pharm. Inc.*, 858 F. Supp. 2d 341, 367 (D. Del. 2012).

116.     **Acceptance and Praise.**  Sutent® revolutionized the treatment of RCC and PNET and the excitement and acclaim it received reinforce the non-obviousness of the claims-in-suit.  FOF ¶ 67; *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1311 (Fed. Cir. 2010); *Cordis Corp. v. Boston Scientific Corp.*, 431 F. Supp. 2d 442, 456 (D. Del. 2006).

## CONCLUSION

117.     For all these reasons, the asserted claims of the '293 and '905 patents are non-obvious.  A proposed order entering judgment for Plaintiffs is attached as Exhibit E.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Maryellen Noreika*

_____
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
 jblumenfeld@mnat.com
mnoreika@mnat.com

OF COUNSEL:

William E. McDaniels
Thomas H. L. Selby
Jessamyn S. Berniker
Stanley E. Fisher
Scott K. Dasovich
Jessica M. Stoll
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Tel: (202) 434-5000

February 6, 2013

*Attorneys for Plaintiffs Pfizer Inc., Pharmacia
& Upjohn Co., Pharmacia & Upjohn Co. LLC,
Sugen, Inc., CPPI C.V., Pfizer Pharmaceuticals
LLC, and PF Prism C.V.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2013, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 6, 2013, upon the following in the manner indicated:

Philip A. Rovner, Esquire                                    *VIA ELECTRONIC MAIL*
Jonathan A. Choa, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE  19801

T.O. Kong, Esquire                                           *VIA ELECTRONIC MAIL*
WILSON SONSINI GOODRICH & ROSATI
One Market Street
Spear Tower, Suite 3300
San Francisco, CA  94105-1126

Josh A. Mack, Esquire                                        *VIA ELECTRONIC MAIL*
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real
Suite 200
San Diego, CA  92130

Kirin K. Gill, Esquire                                       *VIA ELECTRONIC MAIL*
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304

Robert A. Delafield, Esquire                                 *VIA ELECTRONIC MAIL*
WILSON SONSINI GOODRICH & ROSATI
900 South Capital of Texas Highway
Fifth Floor
Austin, TX  78746

*/s/Maryellen Noreika*
_____
Maryellen Noreika (#3208)